IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

**SAYLOR, C.J., EAKIN, BAER, TODD, DONOHUE, DOUGHERTY, WECHT, JJ.**

| | | |
|---|---|---|
| CENTRAL WESTMORELAND CAREER AND TECHNOLOGY CENTER EDUCATION ASSOCIATION, PSEA/NEA, COLLEEN CONKO, SABINE LYNN, DANIEL LUSK, MATTHEW MORRELL, AND JAMES MARK SCHOMING | : | No. 11 WAP 2015 |
| | : | |
| | : | Appeal from the Order of the |
| | : | Commonwealth Court, entered |
| | : | December 11, 2014 at No. 2336 C.D. |
| | : | 2013 affirming the Order of the Court of |
| | : | Common Pleas of Westmoreland |
| | : | County entered December 4, 2013 at |
| v. | : | No. 1120 of 2011. |
| | : | |
| PENN-TRAFFORD SCHOOL DISTRICT | : | |
| | : | ARGUED: October 6, 2015 |
| APPEAL OF: CENTRAL | : | RE-SUBMITTED: January 20, 2016 |
| WESTMORELAND CAREER AND | : | |
| TECHNOLOGY CENTER EDUCATION | : | |
| ASSOCIATION, PSEA/NEA, COLLEEN | : | |
| CONKO, SABINE LYNN, AND DANIEL | : | |
| LUSK | : | |

*OPINION*

**MR. CHIEF JUSTICE SAYLOR**          **DECIDED: FEBRUARY 16, 2016**

In this discretionary appeal, we examine whether the Transfer between Entities Act – a provision of the Public School Code designed to protect teachers affected by inter-school transfers of educational programs – applies where the transferred students are placed into pre-existing classes and no new classes are added.

In terms of background, the Transfer between Entities Act, 24 P.S. §11-1113 (the "Transfer Act"), imposes hiring obligations on receiving schools when a class or program is transferred from one school to another and a teacher is suspended at the sending school. This aspect of the act has existed since its inception, and provides:

(a) When a program or class is transferred as a unit from one or more school entities to another school entity or entities, professional employes who were assigned to the class or program immediately prior to the transfer and are classified as teachers . . . and are suspended as a result of the transfer and who are properly certificated shall be offered employment in the program or class by the receiving entity or entities when services of a professional employe are needed to sustain the program or class transferred, as long as there is no suspended professional employe in the receiving entity who is properly certificated to fill the position in the transferred class or program.

24 P.S. §11-1113(a).[1]

As described more fully below, students attending math classes at one school were accommodated within existing math classes at another school. Central to this dispute is whether this circumstance implicated a 1991 addition to the Transfer Act which states:

(b.1) Professional employes who are classified as teachers and who are not transferred with the classes to which they are assigned or who have received a formal notice of suspension shall form a pool of employes within the school entity. No new professional employe who is classified as a teacher shall be employed by a school entity assuming program responsibility for transferred students while there is:

(1) a properly certificated professional employe who is classified as a teacher suspended in the receiving entity; or

(2) if no person is qualified under clause (1), a properly certificated member of the school entity pool who is willing to accept employment with the school entity assuming program responsibility for transferred students. . . .

24 P.S. §11-1113(b.1).

---

[1] The Transfer Act is contained within the Public School Code of 1949. *See* Act of Mar. 10, 1949, P.L. 30 (as amended 24 P.S. §§1-101 to 27-2702) (the "Code"). It appears in Article XI(b) of the Code, which relates to employment of professional employees. The Transfer Act was added to the Code in 1982, and has been amended several times, most notably in 1991, as discussed below. It has often been referred to, imprecisely, as the "Transfer *of* Entities Act."

The Central Westmoreland Career and Technology Center, a public vocational-technical school (the "Vocational School"), provides career and technical training to high school students from numerous sending school districts within Westmoreland County, including Appellee Penn-Trafford School District ("Penn-Trafford"). For a number of years, the Vocational School taught math to students from the high schools in such districts who were enrolled in career and technical programs at the Vocational School (the "vocational students"). During this time, the sending school districts were providing the same math instruction to students in their high schools who were not enrolled at the Vocational School.

In early 2010, eight sending school districts, including Penn-Trafford, advised the Vocational School that, beginning with the 2010-11 school year, they would be providing math instruction to the vocational students at the students' home high schools rather than sending them to the Vocational School for math.[2] Due to these changes, the Vocational School curtailed its math offerings and suspended five certified math teachers: Colleen Conko, Sabine Lynn, Daniel Lusk, Matthew Morrell, and James Schoming. *See generally* 24 P.S. §11-1124 (relating to causes for suspension). The Vocational School took the position that no transfer of courses or programs had occurred, and hence, the Transfer Act was not implicated. However, in response to a grievance filed by the Central Westmoreland Career and Technology Center Education Association, PSEA/NEA (the "Association") – a labor organization representing the Vocational School's professional employees – the Vocational School, per Section 1113(b.1), created a pool of suspended employees, consisting of the five furloughed math teachers, and sent their names and certifications to Penn-Trafford.

---

[2] These students continued to attend career and technical training at the Vocational School. The next year, two additional sending school districts took the same action.

Meanwhile, at Penn-Trafford High School, the existing math classes had enough capacity to accommodate the vocational students. Thus, no new math classes were added for the 2010-11 school year. Separately, one of the high school's math teachers, Brian O'Neil, resigned in March 2010 for reasons unrelated to the above circumstances. Penn-Trafford posted a job vacancy announcement to fill his position, and it interviewed nine candidates, including teachers Lusk and Lynn. Penn-Trafford ultimately hired a substitute teacher to fill the vacancy, and he stayed on as a long-term substitute for Mr. O'Neil during the 2010-11 school year.

These events led to correspondence between the Association and Penn-Trafford in the fall of 2010 reflecting that the parties disagreed over whether a program transfer had occurred so as to implicate the Transfer Act. The Association also expressed that, even absent a transfer, Penn-Trafford was obligated under sub-paragraph (b.1)(2) to hire math teachers, in the first instance, from the Vocational School's pool of suspended teachers since the school district did not already have a suspended, certified teacher of its own to recall pursuant to sub-paragraph (b.1)(1). When correspondence failed to resolve the disagreement, the Association, as well as teachers Conko, Lynn, Lusk, Morrell, and Schoming (collectively, "Plaintiffs"), filed a complaint in the county court.[3] Plaintiffs requested a declaratory judgment interpreting the Transfer Act to require Penn-Trafford to hire teachers from the Vocational School's pool. They also sought lost wages and benefits due to Penn-Trafford's failure to do so for the 2010-11 school year.

The parties engaged in discovery and, thereafter, filed cross-motions for summary judgment. The county court granted Penn-Trafford's motion, denied Plaintiffs' motion, and entered judgment in favor of Penn-Trafford. The court agreed with Penn-Trafford's argument that, under the facts of the case, no transfer occurred so as to

---

[3] Teachers Morrell and Schoming are no longer part of this litigation.

trigger the plaintiff teachers' rights under the Transfer Act.  The court noted, in this regard, that no math classes were "dismantled" at the Vocational School and then "reconstituted" at Penn-Trafford High School, and, moreover, no math classes were added at the high school.  *Cent. Westmoreland Career & Tech. Ctr. Educ. Ass'n, PSEA/NEA v. Penn-Trafford Sch. Dist.*, No. 1120 of 2011, *slip op.* at 4 (C.P. Westmoreland Dec. 4, 2013).  As for precedent, the court relied on *Hahn v. Marple Newtown School District*, 132 Pa. Cmwlth. 60, 571 A.2d 1115 (1990), in which the Commonwealth Court addressed a similar situation and concluded that no "transfer" of math classes had taken place because there was no evidence the math classes in question "were taken" from one entity to another.  *Id.* at 65, 571 A.2d at 1117; *see also id.* at 65, 571 A.2d at 1118 (explaining that the Transfer Act "was meant to protect professional employees whose positions were eliminated in one school entity and recreated in another[,] which is not what occurred here").

A three-judge panel of the Commonwealth Court affirmed in an unpublished opinion.  *See Cent. Westmoreland Career & Tech. Ctr. Educ. Ass'n, PSEA/NEA v. Penn-Trafford Sch. Dist.*, No. 2336 CD 2013, *slip op.* (Pa. Cmwlth. Dec. 11, 2014).  The panel acknowledged that the General Assembly added paragraph (b.1) to the Transfer Act in the post-*Hahn* timeframe, and that the court had eventually interpreted paragraph (b.1) as imposing hiring obligations on receiving schools where a vacancy arises which is unrelated to the transferred program.  *See id.* at 8-9 (citing and quoting *Allegheny Intermediate Unit # 3 Educ. Ass'n v. N. Hills Sch. Dist.*, 155 Pa. Cmwlth. 211, 216-17, 624 A.2d 802, 804-05 (1993)).  Still, the panel observed that:  such rule is limited to schools which receive transferred programs of some sort; and, in *Cook v. Chambersburg Area School District*, 97 A.3d 419 (Pa. Cmwlth. 2014), the court had reaffirmed *Hahn*'s understanding that the verb, to "transfer," means to carry or take from

one person or place to another. *See Penn-Trafford*, No. 2336 CD 2013, *slip op.* at 9 (citing *Cook*, 97 A.3d at 425); *see also id.* at 10 (explaining that "the Act is not triggered merely based on the fact that students cease to enroll at one school and instead enroll at another school" (quoting *Cook*, 97 A.3d at 426)). Based on its finding that no educational class or program was transferred from the Vocational School to Penn-Trafford High School, the panel approved the county court's decision to enter judgment in favor of Penn-Trafford. *See id.* at 11.

President Judge Pellegrini dissented on the basis of his dissent in *Cook*, in which he interpreted paragraph (b.1) as imposing hiring obligations on schools that assume educational program responsibilities for transferred students. In the dissent's view, these obligations exist – relative to teachers who have been formally suspended – whether or not a program or class has been transferred as a unit between schools. *See Cook*, 97 A.3d at 428-30 (Pellegrini, P.J., dissenting).

We allowed appeal to determine whether Section 1113(b.1) of the School Code, 24 P.S. §11-1113(b.1), was intended to give employment priority to individuals who are members of a pool of furloughed teachers in the circumstances described above. *See Cent. Westmoreland Career & Tech. Ctr. Educ. Ass'n, PSEA/NEA v. Penn-Trafford Sch. Dist.*, ___ Pa. ___, 114 A.3d 1036 (2015) (*per curiam*).

Plaintiffs assert Section 1113(b.1) requires any school which assumes "program responsibility for transferred students," 24 P.S. §11-1113(b.1), to offer employment to properly certificated teachers in a pool of furloughed employees regardless of whether the vacancy in question is related to the transfer. Plaintiffs contend that the intermediate court's interpretation converts paragraph (b.1) into surplusage, as they state it is difficult to see what purpose a pool of furloughed employees would serve if employment prioritization is only triggered when a program is transferred as a unit. As

applied here, Plaintiffs proffer that, because program responsibility for the mathematics instruction of vocational students was transferred to the school districts, including Penn-Trafford, the teachers in the pool retained employment priority as to vacancies occurring at such districts.

Plaintiffs also take issue with the Commonwealth Court's reliance on *Hahn* in concluding that, for a furloughed teacher's paragraph (b.1) rights to apply, a program must be dismantled at one school and reconstituted at another school. Plaintiffs suggest such a requirement is not supported by (b.1)'s text. They note, in any event, that *Hahn* was decided before the 1991 addition of paragraph (b.1), which they view as broadening the concept of a "transfer" for purposes of the Transfer Act. Further undermining *Hahn*'s applicability, Plaintiffs reference *Allegheny Intermediate Unit*'s explanation that (b.1) was intended to ensure that teachers at entities other than school districts – such as vocational schools and intermediate units – would have increased protection at a time when many furloughs were anticipated due to the transfer of educational programming to school districts, which in turn resulted from a change in educational program funding. *See Allegheny Intermediate Unit*, 155 Pa. Cmwlth. at 218, 624 A.2d at 805.

Penn-Trafford initially observes that the Transfer Act, as applied in *Hahn*, requires that an educational class or program be transferred as a unit between school entities for furloughed teachers to have hiring priority. It suggests this still holds true in the wake of the 1991 legislation, for at least two reasons. First, Penn-Trafford notes that such legislation added the phrase, "as a unit," to paragraph (a), thus demonstrating that "a transfer of a program or a class [is] still the primary focus" of the Transfer Act. Brief for Appellee at 23.

Second, Penn-Trafford contends that paragraphs (a) and (b.1) were meant to be read together, with a class or program transfer being the triggering event for either paragraph. In this respect, Penn-Trafford urges that, had the General Assembly intended to eliminate the need for a transfer of a program or a class as a unit under paragraph (b.1), it would have used more definitive prefatory language in (b.1) such as, "Notwithstanding the requirements of subsection (a), . . .." *Id.* at 24. Absent such phraseology, Penn-Trafford agrees with the *Cook* court's suggestion that the sole purpose of paragraph (b.1) is to add a second layer of protection whereby furloughed teachers are given priority to fill vacancies unrelated to the initial transfer. *See id.* (quoting *Cook*, 97 A.3d at 425-26); *see also id.* at 23 (quoting *Cook*, 97 A.3d at 425 ("[W]e find no language in the 1991 amendment to the Act that abrogates the requirement stated in *Hahn* that there be a 'transfer' of a program or class to a receiving school before a teacher may claim the protection of the [Transfer] Act.")).

The Pennsylvania School Boards Association, as *amicus curiae*, adds that students transfer between school entities for various reasons, and their influx or departure will sometimes affect staffing. It forwards a *reductio ad absurdum* argument, noting that a minimal change consisting of a single student taking math at his or her home school rather than the associated vocational school could lead to the cancellation of one math class at the latter entity. It suggests the Legislature did not intend paragraph (b.1)'s hiring preference to be triggered in such event. In this regard, the School Boards Association argues more generally that paragraph (b.1) is structured to relate back to the transferred-as-a-unit language in paragraph (a), thus demonstrating that (b.1) pertains to a transfer of programs, not students. It concludes, accordingly, that not every movement of students is a transfer for purposes of the Transfer Act.

Resolving this appeal centrally requires ascertaining the meaning of paragraph (b.1) of the Transfer Act. The issue is one of statutory interpretation, a question of law over which our review is *de novo* and plenary. *See In re D.L.H.*, 606 Pa. 550, 563, 2 A.3d 505, 513 (2010). There is little doubt that the definition of "transfer" employed by the *Hahn* decision – meaning, "to carry or take from one person or place to another," *Hahn*, 132 Pa. Cmwlth. at 64, 571 A.2d at 1117 – is in accord with the plain meaning of the word and, as such, is applicable here, since neither the Code nor the Statutory Construction Act otherwise defines the term. *See* 1 Pa.C.S. §1903(a) (generally directing that words and phrases should be construed according to common usage). The contested issue is whether a transfer of students, as opposed to programs or classes, between entities is sufficient to invoke the employment protections afforded under paragraph (b.1).

A careful review of the statutory text reveals that, although the rights conferred under paragraph (a) are limited to situations in which a program or class is transferred as a unit, paragraph (b.1) is markedly different and does not suggest such a limitation. First, entrance into a pool of teachers can be predicated on the mere receipt of a formal notice of suspension. This condition, which is listed in paragraph (b.1)'s initial sentence, constitutes a separate and independent basis for inclusion in the pool, as demonstrated by the legislative use of disjunctive phraseology. As such, it applies even where no classes or programs have been transferred from the school entity in question.

More important, the operative facet of paragraph (b.1) – its second sentence – grants employment prioritization in situations where another school entity "assum[es] program responsibility for transferred *students*[.]" 24 P.S. §11-1113(b.1) (emphasis added). While this may occur when a class or program is transferred, it may also occur when students are transferred between identical or substantially similar educational

programs, as occurred in the present matter. The Legislature appears to have intended to include this latter possibility because, unlike paragraph (a), paragraph (b.1) makes no mention of any transfer of classes or programs. Indeed, to the contrary, it does not refer to transferred classes at all and, instead, centers on the circumstance that a school entity assumes program "responsibility." *See generally Commonwealth v. Elliot*, 616 Pa. 524, 534, 50 A.3d 1284, 1290 (2012) (observing that when the General Assembly uses different words or phrases in a statutory provision, a presumption arises that the legislative body intended those words or phrases to have different meanings).

Under these circumstances, it would be tenuous to read into the phrase, "assuming program responsibility for transferred students," a requirement that a class or program must have been transferred as a unit.[4] We therefore conclude the General Assembly intended the trigger for employment prioritization under paragraph (b.1) to be broader than that of paragraph (a). In particular, we find that the transfer of students and the assumption of program responsibility by the receiving entity are alone sufficient to implicate the protections conferred under paragraph (b.1).

The order of the Commonwealth Court is reversed, and the matter is remanded for further proceedings.

Mr. Justice Eakin did not participate in the consideration or decision of this case.

Mr. Justice Baer, Mmes. Justice Todd and Donohue and Messrs. Justice Dougherty and Wecht join the opinion.

---

[4] To the degree there is any remaining doubt based on the concept that a school entity's assumption of program responsibility presupposes that a program has been transferred, we note that the Transfer Act is remedial legislation designed to protect the employment interests of furloughed professional school employees. Hence, the act is to be liberally construed to effectuate its objectives, with doubts resolved in favor of the conferral of such protection. *See* 1 Pa.C.S. §1928(c).